All rise. Hear ye, hear ye, hear ye. This Honorable Appellate Court of the 2nd District is back in session. Pursuant to adjournment, the Honorable Robert E. Gardner. Please be seated. This case is all but concluded. 17-0003, Dr. Oxygen Service Inc. doing business with MedCast Solutions. Thank you to the Appellate League, the Cannon Management Group, the Canyon Appellate, and the Phoenix River Construction Company for being our customers. Thank you. Thank you. Mr. Wills. May it please the Court, my name is Gary Wills. I'm here on behalf of the Appellate Freedler Construction Company. I'd like to thank you on behalf of my client for the ability to come here and argue this morning. This case presents a novel and unique situation. None of the briefs that were filed by the parties in either the lower court or in this court deal with a situation like this, where an indemnitor of a surety in a federal construction project stepped in after the prime contractor abandoned the project, took over the project, completed it, only to find out afterwards there was a judgment creditor in an unrelated case that was asserting a judgment lien on the payment for the work that was done. We believe that there are two main issues here, and that first is whether the disputed funds are an asset of the judgment debt, or second, precisely what Freedler's role was in the project, whether it was, as we believe, stepping in as the general contractor, the prime contractor, or as Appellee argues, as a subcontractor. To address the first point, what it is that is disputed. Let me ask you a question. Do you think that if Mr. Freedler hadn't taken over the contract from Cannon that he would have been able and qualified to get this contract from the VA? Yes, we do, Your Honor. He's a, Freedler Construction is a general contractor. It doesn't enter into subcontracts, which is why they stepped in to take over. As was referenced in one of the documents in there where he's, Mr. Freedler is writing to the surety, Freedler stepped in precisely because it was able to take on the role of prime contractor and could do it more efficiently and less costly than other contractors could and could ensure that the project got completed in an efficient manner. He took it over after Cannon was not able to do it. Right. Cannon, as you recall, sent the contracting officer an email stating, I'm pulling off the site, deal with it in court. After that point, Cannon was not involved at all in the rest of the project. When Freedler went in and met with the VA and went over what needed to be done, the VA specifically said they did not want Cannon involved anymore. And then the letter that Freedler wrote to the surety made clear that Cannon will not continue to work as a subcontractor on this project. In other words, not only was Freedler taking over as the contractor, the prime contractor, wasn't going to hire Cannon as a subcontractor on it. Did your client indemnify Mr. Cannon? It did not have to because it stepped in and took over the project. So they stepped in, took over the project, and not only completed the project under the performance fund, but also paid off the subcontractors. So my client was out of pocket. I believe it was several hundred thousand dollars as a result. Well, you didn't necessarily answer my question, which was, was there, maybe I should have rephrased it in a more narrow, accusatory way, which is, was there an indemnification agreement between your client and Mr. Cannon? Not whether or not somebody took something over so it didn't kick in or maybe it didn't exist. I don't know. So I'm asking, was there an indemnification agreement? I'm not aware of any such agreement between Freedler and Cannon, and the record doesn't have that. The indemnification was Freedler and Mr. Cannon were both the indemnitors with the indemnification agreement with a surety, Zurich. There was a surety. Was it in addition to Freedler, or was Freedler a co-surety with some bond company? The surety was Zurich, and Freedler and Mr. Cannon were the indemnitors under that security agreement, under that indemnification agreement for the performance bond. Well, why would Freedler be involved in this if they weren't involved in the contract originally? Well, they weren't involved in the contract between the VA and Cannon. Right. Right. They were involved because the surety, Zurich, had performance bonds and payment bonds, as required under the Miller Act, and Freedler was Zurich's indemnitor under the bonds, so they were ultimately liable if Cannon didn't complete the project. So, Mike, what I'm trying to get to is what's the privity, what's the relationship here that would give some rationale or some reason for your client to be involved in assuring the execution of the contract? I'm not sure if I follow. The reason is because of the performance bond that's required under the Miller Act, and pursuant to that performance bond. Well, did your client get paid money to sign on the dotted line? I'm not sure. To be honest, I don't know what the reasons and what the agreement was for becoming the indemnitor, and there's nothing in the record about that. I'm trying to figure out the Abbott and Costello routine, who's on first, what's on second, and so on and so forth, and you haven't really clarified it as far as I'm concerned so that I can understand, number one, how Freedler got involved in this in the first instance, not why they got involved in it after Cannon defaulted, but why they were in from the get-go. The original reasons and consideration for entering into the indemnification agreement with Zurich, those were part of the record below, and, frankly, I'm not aware of exactly what that was. There was some sort of agreement pursuant to which Freedler agreed to be the indemnitor under the Zurich agreement. And you don't know whether it was for money, kinship, or affection? Or some other reason. Or some other reason, yes. Okay. You go into a great deal of time in the brief and hear about the agreement between these parties, you know, Freedler, the VA, the surety, who's going to take over. I mean, what difference does that have to us concerning Freedler's prior to the lien over a creditor with a perfected judgment? Perfected judgment lien. Well, I think it's important, first, it explains why Freedler stepped in. Well, I mean, again, it explains that. We're talking about priority of lien here. It's a legal concept. All these facts are out there. I understand why, you know, not why, but what people did. But, again, Freedler has a perfected judgment lien on the books. Why does any of that make a difference? I think it's oxygen. Yeah, oxygen. Sorry, oxygen. Well, because the perfected judgment lien only attaches to an asset of the judgment debtor. And because of the reasons we set forth in the background, Freedler stepped in and took over after Cannon abandoned the project. So Cannon did no work, had no right to any of that money. It was not an asset of Cannon's. But he's still a privity of contract with the VA. That's correct. And for that reason, the funds had to be dispersed to the Cannon account. But just the fact they had to pay into that account under the federal regulations does not mean that it was an asset that was belonging to Cannon. So that's one reason to answer that good question. Also, I think that, you know, in the alternative, we argued that equitable subrogation was another reason why the disputed funds of $76,000 plus was not an asset of the judgment debtor. And under that doctrine, as the indemnity or the surety, Cannon could come in to assert all the rights of, excuse me, Freedler could come in to assert all the rights of Cannon. And one of the cases that the appellee actually cited, the Jacobs case from Pennsylvania, I think is helpful in this in kind of setting forth the doctrine of equitable subrogation. And that court made clear that subrogation is not a contract right and the balance due was not a security interest such that the surety in that case had to file an Article IX financing statement. As a result of that, the funds were not an asset that was available to the general creditors in that case. So by stepping in and taking over for Cannon, Freedler kind of was a successor of Cannon's right to the money and cut off the money before it became an asset of Cannon that the judgment lien would attach to. And I think the relative to equitable subrogation, equity or chancery is very fact specific. And in order for us to determine that for some reason, based upon equity and fairness, we are asked to determine that a judgment creditor should not be given priority over someone who has yet to have a judgment entered in their proceedings against Cannon. And so if we're supposed to determine the relationship between the parties to determine if there's some collusion or whether your client is without fault, without knowledge, without notice, it becomes difficult if we don't know what the relationship between the parties is or are. Well, Your Honor, there's no evidence of any kind of collusion or any wrongful behavior on the part of Freedler. The evidence does show that they did step in and they completed the work. They paid off the subcontractors. And that's the only reason why any of these disputed funds were even available. If Freedler hadn't done so, the contract would have been terminated and there would have been no money for the judgment creditor to claim an interest in. And also, going to the equities here, Freedler is without any other remedy absent this. Was there some condition of the contract or whatever that precluded your client from filing a mechanics lien claim? Well, it's a federal contract, so you can't go by mechanics lien. You'd have to go under the Miller Act. And under the Miller Act, that's only available to the subcontractors. And Freedler was stepping in the shoes as the prime contractor, so that's not an avenue that was available to Freedler. It has no contract other than the indemnification agreement with Zurich, with the surety. If it went after the surety, it would be going after itself in effect. It had no contract with Cannon relating to this or with the VA relating to this. So I think the fact that they have no complete and adequate remedy at law also balances the equities in its favor. Why couldn't your client file suit against Cannon? Well, it has no contractual agreement with them at all. Well, wasn't Cannon holding the money in an account in what would certainly be arguably be an equitable trust? I mean, if they didn't do any money for it, if they basically got the money only because they were the prime contractor, but they weren't doing any more work on it and Freedler was the one doing the work and earned that money, wouldn't you be able to make out a case for an equitable trust? Or maybe perhaps conversion. But even so, if that were the case, that if they did have that remedy, that would also just show that, you know, if these funds were being converted and were not a funded assets of Cannon, it's also something that the judgment meeting could not attach to. The equitable subrogation may apply if other people's rights are violated, correct? Given the balance of the equities, correct. So why wouldn't someone who could protect the judgment meeting who was first in time and they don't get the money that's sitting there, that doesn't affect their rights? I don't think so because, as I mentioned before, it kind of cuts off the payments before it becomes an asset of Cannon that their judgment meeting could enter into. The money doesn't even flow through, shouldn't even flow through Cannon under that doctrine. It goes to Freedler then and therefore it's not an asset that the judgment meeting would attach to. But wasn't the money deposited in Cannon's account before the contract was terminated? That's correct, Your Honor. It was actually deposited into a different party's account, Vet Tech, which I was not involved in the underlying issues, but apparently that was an affiliated company with Cannon that was part of the fraudulent transfer. So it was not even dispersed to an account that belonged to Cannon, it belonged to Vet Tech. And that goes into the federal regulations and the privy contract between the VA and Cannon. Under those regulations, the only party it could be dispersed to was Cannon. So the money had to go, if the VA was dispersing that money because the contract had not been officially terminated at that point, even though Cannon had abandoned it, it had to go into the Cannon account. I think the appellee claimed that Mr. Cannon directed the federal government to deposit the funds in that account, which a person might interpret as badges of ownership. In other words, the power to direct where money should go would suggest that you would reasonably lay some claim for the right to control those funds? Well, the funds had to be dispersed pursuant to the federal regulations. I don't know what Mr. Cannon may have said or not said to the VA about that, and that was apparently part of the whole fraud and fact that they were found guilty of. So I don't think that necessarily suggests anything other than perhaps improper purpose in trying to direct the funds to an account they control. Am I correct in thinking that your primary argument is that these were not funds or assets of Mr. Cannon or the Cannon Company? That's correct, Your Honor. That's the primary argument, and the secondary one was that even if it is an asset, then under equitable subrogation it should be. If that were the case, isn't it a question of fact, or at least a mixed question of fact in law, that the trial court came to to determine that by allowing the transfer to the judgment creditor that these funds were assets of Cannon Group? I believe it was a question of law, but this Court can review de novo based on the record. Well, are you telling me, to me the only way we can review de novo is if the facts were uncontroverted. Are you telling me that the facts were uncontroverted? Well, I think the facts that are uncontroverted are sufficient for de novo review. Okay, which facts are those? The facts that Friedler was the indemnitor of the surety, the fact that Cannon abandoned the project entirely, had nothing to do with it after that point, the fact that Friedler, who would ultimately be liable anyway, stepped in as the general contractor to perform the work, and that it did perform the work in an efficient and timely manner, and that the money had to be dispersed to the Cannon account pursuant only to the federal regulations, and Mr. Grabensky, the contracting officer for the VA, even admitted that they had no problem with dispersing the money to Friedler if that had been permitted under the regulations. So I think those facts are sufficient to determine the issues. Okay. Any other questions? No. Thank you. You'll have an opportunity to make the bubble. Thank you. Ms. Alms? May it please the Court. Good morning. My name is Laura Alms on behalf of Doctors Oxygen. Thank you for allowing us to be here this morning. Doctors Oxygen asked this Court to affirm the turnover order entered by the circuit court to turn over the debtors' funds to Doctors Oxygen. Throughout the case below, doctors spent a considerable amount of time chasing the representations of Friedler as it tried to manufacture a substantial dispute as to the ownership of these funds. As was discussed here today, there are some questions as to the relationship of these parties. And for the circuit court, that ceased to be an issue when the federal government submitted its affidavit to the circuit court. There was no longer a substantial dispute as to the ownership of those funds, and the government's affidavit very clearly sets out the relationship between all of the parties. The uncontroverted facts as Friedler would represent them are in opposite to the information that's contained in the government's affidavit. According to the government's affidavit, we know that Cannon Management Group was the only party that was in privity of contract with the federal government, the only party that could get paid, the only party that was entitled to funds. Cannon was never terminated off the job. But they quit, didn't they? Didn't they say, I'm done? They certainly had a technical default, and the government offered the surety the option of a procedure in lieu of default, which is a federal regulation. The surety accepted the procedure in lieu of default, and Cannon was never terminated. You see in the VA's affidavit, Cannon remained the prime contractor the entire time, and that's the reason the circuit court correctly pointed out that if there was an error here, it was in not terminating the contract. But wasn't that because with the government contracting, that was kind of impossible to do, therefore they just went along getting the work done and allowing Friedler to do it, but keeping Cannon in place, knowing full well Cannon was not doing the work. Certainly, and they could have used Friedler. They could have used any contractor, any party that was qualified to step in and perform that job. The surety could have selected any company. Friedler insisted it be Friedler. It was Friedler's option to enter into that agreement with the surety, which was a totally separate agreement. It had nothing to do with indemnification. There was no bond claim filed by the government. The surety didn't step in on a bond claim that Friedler had to come in and indemnify. They chose not to file a bond claim. Because the government didn't file a bond claim, they proceeded under a completely different procedure. Friedler agreed to be the party to perform. Do you think this is the noble review? No. Why? I think that the question, as it's been manufactured as a dispute, turns on all of the facts that were before the circuit court. And once the circuit court received that VA declaration, all of the misstatements were refuted and we knew the truth. And the manifest rate of evidence or clear error or whatever, higher level of discretion, all points to those funds being funds of the debtor. How about the appellant's argument with respect to equitable subrogation? Well, the appellant does point to a case cited in the Appleby's brief, the Jacobs case. And in all of the cases cited, the federal case law that interprets the Miller Act and similar cases prior to the Miller Act, the surety is the party that gets to equitably subrogate. Not a would-be indemnitor of a surety or a subcontractor that performs work. The surety stands in the shoes. And the VA's declaration in this case said that if the contract were terminated, Friedler would never get paid. The money would go to the surety, according to federal law. And that isn't red tape or a glitch or something to be overlooked. The government followed federal law. The circuit court followed federal law. And the assets are Canada's assets, subject to my client's perfected judgment. You're saying that Friedler was between a rock and a hard place, between the devil and the deep blue sea, and there was no way on God's earth that Friedler was going to take anything beneficial from this scenario? If the assets had not been subject to our lien and we hadn't discovered them and the court hadn't ordered them turned over to us, they're the debtor's assets. I think the debtor probably would have paid its joint venture partner, its colloquially mentor, Friedler. But that has nothing to do with the law. Whatever relationship Friedler and Cannon have, whatever they were involved in totally separate and apart and outside of that agreement, I think that they believed that the money would have come to them because Cannon would have given it to them first. They just didn't count on someone with a higher priority laying claim to the funds first. What I'm suggesting is the scenario you're presenting is that Friedler was in a no-win position unless there was no judgment creditor and there would have been some reconciliation between Cannon and Friedler. Is that correct or not? That's the only way that Friedler, under these facts. I'm not trying to force you to say yes or no. I'm only asking you for your opinion. Under these facts, if the contract proceeded as it did, Cannon would have gotten paid and Friedler would have sought its payment as a subcontractor from the contractor. Those are the forms that it submitted to the federal government as a subcontractor. Interestingly enough, in its reply brief, it tries to claim it's the general contractor. Have you ever heard of the Kobayashi exercise? No. It's something out of Star Trek, the original series, and it's supposed to be a test given to cadets at the academy. It's set up in such a way that you cannot win it. You cannot succeed. You have to fail. So there are situations, even in science fiction, where someone may be in a position where they cannot win. And I was only asking you, is this one of them? From Friedler's perspective, I don't think so because it filed its documents as a subcontractor to get its payment. From a contractor, unfortunately, our lien came into play. Your lien was against Cannon. How about where this money went? BTEC or something like that? So how did you get the money from that? We filed and served our citation on the Cannon Management Group. Thomas Cannon presented himself for examination, and out of that examination, we discovered that he had the successor entity, BTEC, along with many other things that we presented in an emergency motion for TRO. We obtained the temporary restraining order. The court exercised its jurisdiction over Thomas Cannon, both as CMG and his activities as BTEC. During the course of the proceedings, BTEC filed an appearance, and they said, we've got all this money in our account, and we need it to run our business. Well, lo and behold, we found out that the money came from an ACH deposit from the U.S. Treasury to Cannon Management Group. It appears that Thomas Cannon changed the titling with the bank so that it became a BTEC account instead of a Cannon Management account. The federal government thought that they were paying into a Cannon Management account, and it turned out not to be the case, which was part of the subject of our fraudulent transfer action. Who told the federal government to put the money there? Cannon. Do you have any reason to believe that the allegations made during this whole hearing by Friedler, that it did the work by this agreement, that it had done the work that was the subject of this payment, do you have any reason to believe that that's not true? No, it's not something that was before the lower court. I don't know what Friedler did or didn't do. Well, assuming all these things are true, and then the trial court relied on a piece of paper, which we can certainly look at as well as the trial court, what factual determinations did the trial court make that subject this to any type of deferential review, manifest way, or whatever? Well, the trial court examined the VA affidavit to determine who had prohibited a contract with the federal government. We could do that too. I mean, the trial court didn't listen to anybody.  and we can read the same piece of paper. Well, there were a series of representations that were made that called those facts into question, and the VA affidavit refuted them conclusively. So there were representations that the contract was terminated, which changes the outcome. If the contract's terminated, then the surety gets paid. If the contract's not terminated, and they go through the procedure in lieu, then canon gets paid, and that's what happened here. But that was a misstatement that was refuted by the VA affidavit. There were a number of them. The fact that there was no claim made by the government on the performance bond. Friedler initially said that there was a bond claim made. It wasn't true. They said that the surety stepped in. It wasn't true. They said Friedler indemnified the surety. It wasn't true. So there were issues of credibility. Certainly. And that was resolved by the VA affidavit. I don't recall you mentioning during oral argument anything about equitable suffocation. Did you say anything about it? She went to the Jacobs case. The Jacobs case that was mentioned by the appellant was one of the cases I said in my brief where the surety was allowed to step in the shoes of the general contractor, which follows the entire Miller Act and pre-Miller Act line of case law where the surety is allowed to equitably suffocate, not a would-be indemnitor of the surety had there been a bond claim even made, which there was not. Are you done? Just that we ask that this court affirm the circuit court's turnover order of the debtor's funds to Dr. Saxogen. Did her time go up? We can keep talking if you want, or we can talk about the Kobayashi exercise. I've always been one to start wars. Well, Captain Kirk actually broke into the academy and changed the program so that he could feed it. There's more than one way to skin a cat. I'd certainly be more than happy to talk about the balance of equities or any other questions that the panel may have. I don't have any. Thank you. Thank you. Mr. Wills. I want to point out that the Friedler file in the lower court verified pleadings and nothing in those verified pleadings were ever challenged. There's no credibility determination by the lower court or any challenge to Friedler's credibility on any of these issues. Second, there are discussions about whether it's a no-win situation for Friedler under the Eppley's theory it is. I'd say that the law is in accord with James Tiberius' clerk and that there is no such thing as a no-win situation because that's where the doctrine of equitable subrogation comes in and that gives Friedler his right to the monies. The equities defeat the Kobayashi rule in this instance. On that point, counsel indicated that the case law, at least the case that she cited, was where the surety stands in the shoes of the general contract when there's a claim made against the surety, and your client is a step or two removed from that. I think in those cases it was the surety. I can't cite offhand a case where it was the guarantor, but the federal regulations provide that the surety or the guarantor can come in and complete the work, and in this case Friedler is basically in line with the surety and can assert those rights. It's just like in general subrogation matters. So I don't think that that's really an extinction, even though those cases said that. And then the final point I just wanted to make is that Diappoli mentioned numerous times the VA contracting officer's affidavit, and I think that affidavit was internally consistent in that parts are consistent with what Friedler says, that Friedler was taking over the project, that they were willing to pay Friedler for the money, which they wouldn't have agreed to if Friedler was just coming in as a subcontractor. I think the statement that Friedler was a subcontractor is just a misstatement, and it's inconsistent with all the other facts laid out, not just in his affidavit, but in the rest of the record showing what Friedler did on this project. And that was my last point, unless you have any other questions. If I recall correctly, you kind of subbed in for someone who was the attorney at record, is that correct? That's correct, Mr. Filer, yes. I don't usually say it, but I think you did a very good job of stepping in on such short notice. Thank you, Your Honor. Thank you. We'll take the case under advisement. It's going to be a short recess. There's another case on the call.